IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

FAITH STEINMAN,

       Plaintiff,

vs.                           CASE NO. 1:15-cv-51-WS-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for disability insurance benefits pursuant to Title II of the Social

Security Act. (ECF No. 1.) The Commissioner has answered (ECF No. 9),

and both parties have filed briefs outlining their respective positions. (ECF

Nos. 16, 17.) For the reasons discussed below, it is recommended that the

Commissioner's decision should be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed her application for disability insurance

benefits under Title II on January 24, 2012, alleging a disability onset date

of May 20, 2011. (R. 198–99.) Plaintiff alleged several impairments,

including degenerative disc disease, attention deficit hyperactivity disorder,

nervousness, depression, poor memory, and poor concentration. (R. 97.)

Her application was denied initially and upon reconsideration. (R. 135–46.)

Following a hearing on May 7, 2013, an administrative law judge ("ALJ")

issued a decision unfavorable to Plaintiff on June 20, 2014. (R. 21–95.)

The Appeals Council denied Plaintiff's request for review on January 21,

2015. (R. 1–4.) On March 20, 2015, Plaintiff filed the instant appeal to this

Court. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by

substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence

is more than a scintilla, i.e., the evidence must do more than merely create

a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971));

*accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental

impairment that can be expected to result in death, or has lasted or can be

expected to last for a continuous period of not less than twelve months. 42

U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[1] The impairment

must be severe, making Plaintiff unable to do his previous work, or any

other substantial gainful activity which exists in the national economy. 42

U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20

C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the

existence of a disability as defined by the Social Security Act. *Carnes v.*

*Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is

working at a substantial gainful activity, he is not disabled. 20 C.F.R. §

404.1520(b). Second, if a claimant does not have any impairment or

combination of impairments which significantly limit his physical or mental

ability to do basic work activities, then he does not have a severe

impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a

claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d).

---

[1] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2] The

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled. *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion." *Wolfe v. Chater*, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Walker*, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation."). In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment. *Walker*, 826 F.2d at 1003.

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform. *Wolfe*, 86 F.3d

at 1077–78. Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence. *See id.* Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner. *Hale v. Bowen,* 831 F.2d 1007, 1011 (11th Cir. 1987).

## III.  SUMMARY OF THE RECORD

## A.  Medical Evidence

On March 27, 2011, Plaintiff was admitted to North Florida Regional Medical Center complaining of low back pain, right hip pain, and right leg pain all the way to the foot. (R. 319.) Plaintiff reported that symptoms were made better with cold, heat, or stretching and that they were made worse by pulling and pushing. (*Id.*) Plaintiff stated that her symptoms began in May 2010 with no known injury. (*Id.*) A physical examination disclosed that Plaintiff was in no apparent stress. (*Id.*) Dr. John Stevenson diagnosed Plaintiff with multilevel lumbar degenerative disk disease and Plaintiff agreed to undergo surgery the following day. (R. 320.) Plaintiff underwent surgery on March 28, 2011. (R. 323–26.)

At her followup appointment with Dr. Stevenson on April 15, 2011,

Plaintiff reported some back pain but no leg pain. (R. 365.) Then on June 24, 2011, Plaintiff reported that she was doing better, while Dr. Stevenson noted that Plaintiff "really is improved over the last couple of months." (R. 364.) At another followup on September 20, 2011, Plaintiff stated to Dr. Stevenson that she recently started having increasing lower back pain, right hip pain, and right groin pain, which became worse with activity and which was relieved by rest. (R. 363.) Dr. Stevenson ordered a lumbar CT scan. (*Id.*)

Plaintiff underwent Chinese Acupuncture on June 8, 2011. She reported that her low back pain and sciatica decreased to a 1–2 for that day and her pain was a 2–3 the following day. (R. 346.) On June 16, 2011, Plaintiff reported that she felt very good and that her pain intensity was a 1–2 , noting that she was able to take a very low dosage pain killer the previous two days. (R. 347.)

On September 14, 2011, Plaintiff saw Dr. Robert Ruano at Innovative Back Solutions for her back pain. (R. 415.) Plaintiff stated that she performs light exercise on a regular basis. (*Id.*) She rated her pain as being a 7 on a scale of 10 and stated that it bothers her between 76 and 100% of the time. (*Id.*) Further, she said that her symptoms have moderately

interfered with her work and social activities. (*Id.*) Plaintiff reported that she is not currently taking any medications for her pain. (*Id.*) After examination, Dr. Ruano diagnosed Plaintiff with herniation or displacement of lumbar disc without myelopathy, lumbar region subluxation, and unspecified myalgia and myositis. (R. 416.) At follow ups on September 14, 2011 and September 26, 2011, Plaintiff reported pain of 7 and 6, respectively, on a scale of 10. (R. 422–23.) Dr. Ruano taught Plaintiff lower posture exercises to alleviate her pain. (*Id.*) Before her visit ended Plaintiff stated that she felt slightly better. (*Id.*)

At her followup appointment with Dr. Stevenson on November 9, 2011, although the lumbar CT showed that she had a solid fusion at L4-5 and L5-S1 without a complicating process, Plaintiff reported increasing back, right hip, and leg pain. (R. 362.) Dr. Stevenson recommended a lumbar epidural steroid injection. (*Id.*) At her followup on December 27, 2011, Plaintiff reported that the lumbar epidural steroid injection helped with her back pain. (R. 361.) She also stated that she was able to wean off narcotics after her lumbar injection. (*Id.*)

On December 8, 2011, Plaintiff went for a neuropsychological examination by Dr. Catherine Price, Caleb P. Peck, Psy.D., and Callie

Beck Dunn, M.S., to document her cognitive status in an attempt to assist with differential diagnosis and treatment options. (R. 350.)

Plaintiff reported forgetfulness, decreased concentration, and difficulty with writing and spelling. (*Id.*) But, Plaintiff stated that aside from difficulty completing household tasks without back pain, she did not have difficulty with other instrumental and basic activities of daily living. (*Id.*) Plaintiff also reported that she enjoys water activities and engaged in regular exercise. (R. 351.) Tests revealed "average intellectual functioning and academic achievement," "average attention, working memory, and processing speed," "intact language and language related functions," "adequate perceptual, spatial, and construction functions, "variability in [her] memory abilities, with reduced performances on measures requiring her to rapidly structure new verbal or visual information for efficient learning to occur," "intact cognitive executive abilities as measured by tasks of verbal and nonverbal reasoning, mental set-shifting, and problem solving," and "elevated anxiety and depression along with concerns regarding chronic health problems." (R. 352–54.) Because Dr. Price determined that Plaintiff's cognitive concerns were associated with emotional distress, pain, and fatigue—and not a progressive disorder—Dr. Price recommended

learning techniques to manage fluctuations in mood, training in managing her chronic pain, and learning memory strategies. (R. 354.) Notably, Dr. Price also recommended that Plaintiff continue to engage in regular physical exercise. (*Id.*)

On December 9, 2011, at her followup visit with Dr. Ruano, Plaintiff reported her lower back pain as being a 5 on a scale of 10. (R. 419.) Plaintiff also saw Dr. Gregory Murad at Shands at the University of Florida that same day. (R. 472.) After examination Dr. Murad "reassured her that there were no major abnormalities on her exam, and that she should continue with non-operative treatment, to include [physical therapy], acupuncture, chiropractic, or interventional pain management," instead of seeking surgical intervention." (R. 474.)

On December 15, 2011, Plaintiff underwent a lumbar epidural steroid injection. (R. 398.) Plaintiff's pain decreased from a 2 out of 10 pre-procedure, to a 1 out of 10 post-procedure. (*Id.*) Plaintiff then went for a followup visit with Dr. Ruano on December 19, 2011. (R. 417.) She reported her lower back pain as now being a 4 on a scale of 10. (*Id.*) Then on January 4, 2012, Plaintiff again rated her pain as a 4 on a scale of 10. (R. 423.)

Plaintiff went for a followup with Dr. Stevenson on February 22, 2012, at which time she reported bilateral SI joint pain. (R. 457.) Dr. Stevenson ordered a right SI joint block. (*Id.*) The right SI joint block was performed on March 7, 2012. (R. 484.) The next day, at one of her psychotherapist sessions with Lori Waxenberg, Ph.D., Plaintiff reported that her pain symptoms were greatly reduced after her spinal injection, causing her to feel "hypo-manic" and wanting to perform numerous activities. (R. 462.)

At her April 19, 2012 session, she stated that her pain and condition had steadily improved over the previous month while she visited South Florida, although she recently exacerbated her pain after being pushed into a shallow pool. (R. 469.) On April 20, 2012, at her followup with Dr. Stevenson, Plaintiff stated that her SI joint block decreased her pain from a 4 to a 3 and that she got better relief for several days after she went home, including complete relief of pain. (R. 483.)

Plaintiff again saw Dr. Waxenberg on July 11, 2012, reporting improved mood and pain. (R. 503.) She stated that she has been pacing herself well so as not to exacerbate her pain. (*Id.*) Plaintiff wanted to find a job that is "work as needed." (*Id.*)

At her next session on July 18, 2012, Plaintiff stated that her pain

was slightly elevated, which may have been from over-exerting herself on gardening tasks. (R. 502.) At her August 1, 2012 session, she also reported increased pain due to gardening. (R. 500.) At her next session she again reported increasing pain but stated that she would be traveling to Oregon and California with a friend over the next month. (R. 499.)

Plaintiff next saw Dr. Waxenberg on September 19, 2012, but reported that she did not go on her trip due to a change in her friend's schedule. (R. 498.) She stated that several days earlier she tripped on a hole in the ground after becoming intoxicated, which exacerbated the pain in her hip, back, and legs. (*Id.*)

On November 14, 2012, after returning from a trip to Louisiana to visit her son, Plaintiff saw Dr. Waxenberg and reported difficulty performing some of her usual tasks due to her pain, such as yard word, gardening, and opening the windows. (R. 494.)

At her December 5, 2012 psychotherapist session, Plaintiff reported increased pain after putting up her Christmas tree. (R. 492.) Plaintiff also saw Dr. Michael Rozboril on December 5, 2012 for joint pain, who examined Plaintiff and diagnosed her with low back pain syndrome, polyarthralgia, joint pain multiple sites, and abnormal antibody titer. (R.

517.)

On December 19, 2012, Plaintiff saw Dr. Waxenberg again and stated that her pain has improved and that she has made an effort to reduce the stress placed on her back, such as asking neighbors and friends to help move certain objects around her house. (R. 491.)

At her next session after returning from a visit to South Florida, Plaintiff stated that the weather in South Florida was beneficial to her pain levels and that she felt better not having to carry milk cartons or walk around the house. (R. 490.) She claimed that when she returned to Gainesville her pain worsened due to the extended car trip, carrying luggage, and air pressure changes. (*Id.*)

On February 27, 2013, Plaintiff reported that the recent changes in pressure and activity have exacerbated her pain, including throwing a ball to play fetch with her dog. (R. 489.) She also stated that she wanted to eventually return to work but would like to spend more time focusing on the present. (*Id.*)

Then on March 13, 2013, at her psychotherapy session, Plaintiff reported that she has been experiencing increased joint pain throughout her body, which may or may not be related to her back pain and its

associated medications. (R. 487.) Her joint pain is significantly worse when the weather pressure changes. (*Id.*) Dr. Waxenberg noted that Plaintiff was visibly in pain. (*Id.*)

At a followup visit with Dr. Stevenson on March 27, 2013, Plaintiff stated that her previous SI joint injection decreased her pain from a 4 to a 3 and that it provided her with complete pain relief for a half-day. (R. 482.) Thus, Dr. Stevenson ordered another SI joint block. (*Id.*)

## B.  Opinion Evidence

### 1.  Dr. Green

On January 4, 2012, Dr. Sylvia Wolcott Green, M.D., completed a Medical Source Statement of Ability to Do Work Related Activities (Mental) ("MMSM"), and opined that Plaintiff has "poor" ability to work with or near others without being distracted by them and to perform at a consistent pace with regard to work-related mental activities. (R. 408.) Additionally, she said that Plaintiff has "fair" ability to maintain attention and concentration for extended periods, to complete a normal workday or workweek, to respond appropriately to changes in the work settings, to beware of normal hazards and take appropriate precautions, and to set realistic goals or make plans independently of others. (R. 408–09.)

Alternatively, Dr. Green rated Plaintiff as having "excellent" ability to understand and remember short, simple instructions, to carry out short, simple instructions, and to make simple work-related decisions. (R. 408.) In all other categories, Dr. Green rated Plaintiff's ability "good." (R. 408–09.) Dr. Green also opined that Plaintiff had limited ability to perform several tasks at once. (R. 409.)

### 2.  Dr. Raulerson

On January 5, 2012, Dr. Thomas Raulerson completed a Medical Source Statement of Ability to Do Work Related Activities (Physical) ("MMSP"), and opined that Plaintiff could occasionally lift up to 10 pounds, stand and walk for less than 2 hours, sit for less than 6 hours in an 8-hour workday, occasionally balance, never climb, kneel, crouch, or crawl, and must avoid extreme temperatures and vibrations. (R. 425–27.)

### 3. Dr. Bigsby

On February 21, 2012, Glenn Bigsby, D.O. ("Dr. Bigsby"), a Disability Determination Services consultant, completed a Residual Functional Capacity Assessment of Plaintiff to determine Plaintiff's capacity to sustain activity over a normal workday and workweek on an ongoing basis. (R. 97–112.) Dr. Bigsby reviewed Plaintiff's medical records and opined that

Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk for 4 hours, sit for 5 hours, and had no pushing and/or pulling limitations. (R. 106.) Thus, Dr. Bigsby opined that Plaintiff could perform the lifting/carrying, standing, walking, sitting, pushing, and pulling demands of light work. (R. 112.)

### 4. *Dr. Gibson*

On April 23, 2012, Janet Gibson, D.O. ("Dr. Gibson"), a Disability Determination Services consultant, completed a Residual Functional Capacity Assessment of Plaintiff to determine Plaintiff's capacity to sustain activity over a normal workday and workweek on an ongoing basis. (R. 113–29.) Dr. Gibson reviewed Plaintiff's medical records and opined that Plaintiff could perform the lifting/carrying, standing, walking, sitting, pushing, and pulling demands of sedentary work. (R. 128.) Specifically, Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk for 4 hours, sit for 6 hours in an 8 hour workday, and had no pushing and/or pulling limitations. (R. 123.) Dr. Gibson further opined that Plaintiff is able to perform work that is less demanding than the work she did in the past and that Plaintiff's condition is not severe enough to keep her from working. (R. 129.)

## C.  Hearing Testimony

At the hearing on May 7, 2013, Plaintiff was 47 years old. (R. 47.) Plaintiff stated that she has a lot of pain that affects her concentration, level of functioning, and that she has a very hard time retaining even simple things like an easy magazine article. (R. 53.) She testified that she currently takes Gabapentin and has also been taking morphine sulfate since October of 2011. (*Id.*) Plaintiff admitted that she did not always take her medication and that she handled her pain with breathing and meditation because she did not want to become an addict. (R. 54.) Plaintiff also occasionally takes muscle relaxers. (R. 85.)

Plaintiff stated that her worst pain is across the top of her buttocks on the right-hand side and that the pain goes down both legs, but mostly her right. (R. 65–66.) She has the pain every day while she is awake and that on a scale of zero to 25 her average pain is a twelve. (R. 66–67.) Plaintiff has approximately four good days a week. (R. 75.) She has to rest for about an hour and a half to two hours a day by laying down on her bed. (R. 80–81.) On her bad days she is bedridden. (R. 82.)

Plaintiff lives alone in a house with her black labrador retriever. (R. 68–69.) Plaintiff can sit for at least two hours at a time on a good day and

can stand for about two hours at a time. (R. 67.) On a good day Plaintiff

can walk for 12 blocks and she can lift a 50-pound bag of dog food. (R.

68.) Plaintiff takes care of her house, goes grocery shopping, does laundry,

cleans around the house, and gardens. (R. 69–70.) Plaintiff stated that

she'll try to walk on her good days and admitted that it can actually help

loosen things up. (R. 73.) Plaintiff admitted to going to South Florida for a

month to spend time with her mother. (R. 55.) Plaintiff drives herself to her

mother's house, which is approximately a five-hour drive, but she breaks

the drive up into two days. (R. 83–84.) In the summer she will go to the

beach a few times a week or swim at her mother's house on her good

days. (R. 71.)

## D. The ALJ's Findings

The ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through December 31, 2015. (R.

26.) He further determined that Plaintiff had not engaged in substantial

gainful activity since May 20, 2011. (*Id.*) At step two of the sequential

analysis the ALJ found that Plaintiff had the following severe impairments:

degenerative disc disease and an affective disorder. (*Id.*) The ALJ went on

to find at step three of the sequential evaluation that Plaintiff did not have

an impairment or combination of impairments that met or medically equaled one of the listed impairments. (*Id.*)

With respect to Plaintiff's residual functional capacity at step four of the sequential evaluation, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § § 404.1567(b), except that she can only occasionally climb, balance, stoop, kneel, crouch, crawl, and be exposed to vibrations. (R. 28.) Further, the ALJ found that Plaintiff must have the ability to sit or stand at will, she must avoid unprotected heights and hazards, she is limited to simple routine tasks, she can only have occasional interaction with the general public, coworkers, and supervisors, and that she will need assistance with goal setting. (*Id.*) The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible to the extent they conflicted with the ALJ's RFC assessment. (R. 29–30.) The ALJ concluded at step four that Plaintiff was unable to perform any past relevant work. (R. 35.) At step five the ALJ relied on vocational expert testimony to find that Plaintiff could perform

other jobs that exist in significant numbers in the national economy. (R.

36.) Thus, the ALJ concluded that Plaintiff had not been under a disability

from May 20, 2011, through the date of his decision. (R. 37.)

## IV.  DISCUSSION

Plaintiff argues that: (1) there was not substantial evidence to support

the finding that Plaintiff is capable of work at the light exertional level, and

in finding such, the ALJ failed to give "great weight" to Plaintiff's treating

physician's opinion, and (2) the ALJ failed to follow the Eleventh Circuit's

credibility standard with regard to Plaintiff's pain testimony. (ECF No. 16 at

1.)

## A.  There was substantial evidence to support the finding that Plaintiff is capable of work at the light exertional level.

Plaintiff's argument centers around steps four and five of the

sequential evaluation. At step four the ALJ must assess the claimant's

RFC and her ability to return to her past relevant work. §404.1520(a)(4)(iv).

The ALJ must take the claimant's medical evidence and other evidence

into consideration in his RFC analysis. § 404.1520(e). If a claimant cannot

return to her past relevant work, the ALJ moves onto step five to determine

if the claimant can adjust to other work. *Id.*; *Phillips v. Barnhart*, 357 F.3d

1232, 1238 (11th Cir. 2004).

In this case, at step four the ALJ determined that Plaintiff could not return to her past relevant work, but that she has the RFC to perform "light work" with certain limitations. (R. 28.) Specifically the ALJ found that,

> the claimant can only occasionally climb, balance, stoop, kneel, crouch, crawl and be exposed to vibrations. Further, the claimant must have the ability to sit or stand at will, and she must avoid unprotected heights and hazards. Additionally, the claimant is limited to simple routine tasks, and she can only have occasional interaction with the general public, coworkers and supervisors. Lastly, at times the claimant would need assistance with goal setting.

(*Id.*) In reaching his conclusion, the ALJ gave Dr. Green's assessment of Plaintiff "less than significant weight" because Dr. Green was a non-treating source who "was only interpreting other doctors' evaluations and notes." (R. 32.) Similarly, the ALJ gave Dr. Raulerson's opinions "less than significant weight" because "Dr. Raulerson's opinions were not supported by his own objective clinical findings, and they were inconsistent with the claimant's own testimony and with the record as a whole." *Id.*

Because the ALJ here determined that Plaintiff could perform light work, the Court will begin by addressing what light work means. "Light work" is defined in SSR 83-10 as:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in

this category when it requires a good deal of walking or standing—the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work . . . .

Additionally, SSR 83-10 defines "frequent" as:

occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

The ALJ provided a lengthy explanation in his written decision supporting his determination that Plaintiff could perform "light work." While the ALJ did not entirely discount Plaintiff's severe impairments, he noted that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 30.) An independent review of the record supports the ALJ's finding.

Specifically, the record evidences that following Plaintiff's surgery

she reported to Dr. Stevenson that she no longer had any leg pain. (R. 365.) Dr. Stevenson reported that Plaintiff really improved over the few months following her surgery and Plaintiff reported doing better. (R. 364.) Chinese acupuncture also greatly decreased Plaintiff's pain and she even reported being able to take a very low dosage pain killer following her acupuncture sessions. (R. 347.)

Moreover, Dr. Ruano's notes reflect that Plaintiff told him that she regularly engages in light exercise and that her symptoms have "moderately" interfered with her work and social activities. (R. 415.)  When Plaintiff initially saw Dr. Ruano on September 14, 2011 she was not taking any medication for pain. The progress notes also disclose that posture exercises immediately decreased Plaintiff's pain. (R. 422–23.)  And although Plaintiff reported to Dr. Stevenson in November 2011 of increased pain, examination revealed a solid fusion without a complicating process. And notably, the record evidences that a lumbar steroid injection helped decrease Plaintiff's pain. (R. 361–62.)

At her evaluation with Dr. Price, Plaintiff reported that she did not have difficulty with instrumental and basic activities of daily living, other than completing some household tasks. (R. 350.) Further, an examination

by Dr. Murad on December 9, 2011 revealed no major abnormalities. (R. 427.) Subsequent lumbar steroid injections with Dr. Stevenson in December 2011 and March 2012 also reduced Plaintiff's pain. (R. 398, 462.)  The steroid injections appear to have greatly reduced Plaintiff's pain, such that Plaintiff never went back to Dr. Stevenson after March 27, 2013. (or at least there are no medical records disclosing that Plaintiff saw Dr. Stevenson after that.)

As the ALJ pointed out, although Plaintiff claims she has a difficult time bending, lifting things, doing chores, sitting, standing, paying attention, and remembering things, Plaintiff's own responses on her Social Security Function Report and Pain Questionnaire admit that she takes care of her large dog, does light housework, goes outside daily, walks, drives, shops for groceries two times a week for 1–2 hours, pays bills, handles a savings account, uses a checkbook, and does light gardening. (R. 29, 230–42, 252–57.)  At her hearing Plaintiff also admitted that she can sit for at least two hours at a time on a good day, can stand for about two hours at a time, walk for 12 blocks, lift a 50-pound bag of dog food, and is able to drive long distances to visit her mother in South Florida. (R. 67–84.)

Additionally, the medical records show that Plaintiff's testimony

regarding taking morphine sulfate since October 2011 directly contradicts her December 27, 2011 medical record, in which Plaintiff told Dr. Stevenson that she was able to wean off her narcotics after her lumbar injection. (R. 361.)

The ALJ's determination as to Plaintiff's RFC rests mainly on the opinion evidence. The ALJ gave "less than significant weight" to the opinions of both Dr. Raulerson and Dr. Green. (R. 32.)  According to Plaintiff, both Dr. Raulerson and Dr. Green's opinions should have been given great weight because they both had treating relationships with Plaintiff. (*Id.* at 22.)

"When determining a claimant's RFC, the ALJ must give the opinion of a treating physician 'substantial or considerable weight unless good cause is shown to the contrary." *Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 901 (11th Cir. 2012) (quoting *Phillips*, 357 F.3d at 1240)).  An ALJ may disregard a treating physician's opinion in a social security disability proceeding as long as there is good cause and the ALJ clearly articulates the reasons for doing so. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2)

evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" *Id.* (quoting *Phillips*, 357 F.3d at 1241). The Eleventh Circuit has found "good cause" to exist where the doctor's opinion was not bolstered by the evidence and was merely conclusory. *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987); *see also Winschel*, 631 F.3d at 1179 (an ALJ does not give a treating physician's medical opinion considerable weight when the ALJ only references the treating physician once, merely noting that the claimant saw the doctor monthly); *Vuxta v. Comm'r of Soc. Sec.*, 194 F. App'x 874, 877 (11th Cir. 2006) (good cause existed where the treating physician initially assessed the claimant as being extremely limited but his later medical records indicated significant improvement with treatment); *Phillips*, 357 F.3d at 1241 (an ALJ does not need to give a treating physician's opinion considerable weight where evidence of the claimant's daily activities contradict the opinion); *Edwards v. Sullivan*, 937 F.2d 580, 583–84 (11th Cir. 1991) (good cause exists where a stated restriction contains no clinical data to support the opinion as to restricted work, where clinical permission to return to work does not impose any limitation on the number of hours worked, and where the doctor conceded he was not sure

he could objectively assess the claimant's condition).

The ALJ did not err in his assessment of either Dr. Green or Dr. Raulerson's opinions. Dr. Raulerson, as Plaintiff's treating physician,[3] opined that Plaintiff could occasionally lift up to 10 pounds, stand and walk for less than 2 hours, sit for less than 6 hours in an 8-hour workday, occasionally balance, never climb, kneel, crouch, or crawl, and must avoid extreme temperatures and vibrations. (R. 425–27.) The ALJ did not accord Dr. Raulerson's opinions significant weight because his opinion were "not supported by [Dr. Raulerson's] own objective clinical findings, and they are inconsistent with the claimant's own testimony and with the record as a whole."  These reasons satisfy the Eleventh Circuit's "good cause" standard. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d at 1179.

An independent review of the record supports the ALJ's findings. As the Commissioner points out, after Plaintiff's alleged onset date, Dr. Raulerson's reports document only one abnormal physical exam, and disclose that he continued Plaintiff on pain relievers (R. 430–34.) Additionally, Dr. Raulerson's progress notes document that Plaintiff: (1)

---

[3] The parties do not contest whether Dr. Raulerson was Plaintiff's treating physician. Additionally, Dr. Raulerson is listed as Plaintiff's primary care physician. (R. 414.)

reported pain levels of 1–2 and 2–3 while undergoing Chinese acupuncture in June 2011, (2) was able to wean off narcotics after her lumbar injection, (3) had a normal examination in December 2011 with Dr. Murad that revealed no major abnormalities, and (4) reported a pain level decrease from a 2 to a 1 after a steroid injection in December 2011. (R. 346–47, 361, 398, 472.)

Plaintiff's psychotherapist records also reveal that although Plaintiff's pain may have increased at points, much of Plaintiff's reported increased pain was caused, for example, by being pushed into a pool, throwing a ball with her dog, gardening, putting up a Christmas tree, tripping in a hole while intoxicated, and taking extended car rides to South Florida and carrying luggage. (R. 419, 489–90, 492, 498, 500.) The record suggests that when Plaintiff avoids these types of activities and minimizes the stress on her back that her pain is minimal. Plaintiff also admitted that walking actually helps loosen things up. Plaintiff said she is able to walk at least 12 blocks, can go on extended vacations, drive long distances, go swimming, lift 50 pounds, go grocery shopping, do laundry, clean the house, and garden. (R. 69–73.)

Where, as here, the claimant's daily activities contradict the opinion

of a treating physician, an ALJ may rely on that evidence in discounting the

opinion of the treating physician.  *Phillips*, 357 F.3d at 1241. Considering

that Plaintiff's daily activities contradict Dr. Raulerson's opinion, the ALJ did

not err in declining to give Dr. Raulerson's opinion considerable weight.

Turning to Dr. Green, Dr. Green opined that Plaintiff has "poor" ability

to work with or near others without being distracted by them and to perform

at a consistent pace with regard to work-related mental activities. (R. 408.)

The ALJ declined to give this opinion significant weight and clearly

articulated the reason for doing so:

> The undersigned has considered the assessment offered by
> Dr. Green. The undersigned notes that Dr. Green was only
> interpreting other doctors' evaluations and notes. Although, Dr.
> Green's findings are somewhat consistent with the record, the
> undersigned notes that non-treating sources are unable to
> develop an accurate and longitudinal picture of the claimant's
> conditions. Therefore, the undersigned accords less than
> significant weight to Dr. Green's assessment.

(R. 32.)  The ALJ was not required to give Dr. Green's opinion substantial

weight because she was a non-examining physician. *See, e.g.*, *Spencer ex*

*rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985) ("[R]eports of

physicians who do not examine the claimant, taken alone, do not constitute

substantial evidence on which to base an administrative decision.").

Secondly, the ALJ's finding does not completely contradict Dr.

Green's opinion. The ALJ included in his RFC findings several mental activity limitations. These limitations include: "[T]he claimant is limited to simple routine tasks, and she can only have occasional interaction with the general public, coworkers and supervisors. Lastly, at times the claimant would need assistance with goal setting." (R. 28.)  Included in Dr. Green's opinions was her assessment that Plaintiff has fair, good, or excellent abilities in various mental and social categories. (R. 408–09.) Thus, while the ALJ did not give Dr. Green's opinion "substantial weight," as the Commissioner says, the ALJ's overall RFC finding, nonetheless, does suggest that the aLJ gave Dr. Green's opinion some weight.

Further, substantial evidence supports both the cognitive limitations the ALJ included in his RFC assessment and the ALJ's determination to give Dr. Green's opinion less than substantial weight.

In support of her MSSM, Dr. Green cited "objective cognitive testing done winter 2011." (R. 406.)  The record discloses that Dr. Green's reference apparently was to the neuropsychological evaluation performed by Dr. Price on December 8, 2011. (R. 350–55.) Although Plaintiff reported forgetfulness, decreased concentration, and difficulties with writing and spelling, cognitive tests performed by Dr. Price revealed otherwise. These

tests showed that Plaintiff had "average attention, working memory, and

processing speed," "variability in [her] memory abilities, with reduced

performances on measures requiring her to rapidly structure new verbal or

visual information for efficient learning to occur," and "intact cognitive

executive abilities as measured by tasks of verbal and nonverbal

reasoning, mental set-shifting, and problem solving." (R. 352–54.)

Alternatively, Dr. Price also noted "elevated anxiety and depression along

with concerns regarding chronic health problems." (*Id.*)

Similarly, Dr. Waxenberg's progress notes suggest that Plaintiff's

depression and concentration problems arose partly from failed

relationships. These notes also reveal that Plaintiff was on time, alert, and

oriented for every appointment, and evidence that Plaintiff had improved

mood over time. Perhaps most importantly, in July 2012 after multiple

sessions and treatment with medication, Dr. Waxenberg concluded that

Plaintiff's depression was in remission. (R. 503.)

As the Commissioner points out, the record shows that Plaintiff

participates in extensive regular activities that undermine the limitations in

concentration and social functioning noted by Dr. Green, including

shopping, socializing and vacationing with friends, and maintaining her

finances. Thus, the Court concludes that substantial evidence supports the ALJ's mental RFC finding. Considering substantial evidence supports the ALJ's step four analysis, the ALJ correctly proceeded to step five in the sequential analysis to determine if Plaintiff could perform other work.

Lastly, Plaintiff argues that the ALJ erred at step five in finding that she can perform other jobs because she can not be expected to attend any employment on an 8-hour day for five days a week.  As support for this argument Plaintiff points to a treating physician, Bruce E. Thomas, M.D., who Plaintiff says limited her to standing or walking with a hand held device for a maximum of fours hours a day. (ECF No. 16 at 19.) The problem with this argument is that there are no opinions nor any treatment records in the record in this case from a Dr. Bruce E. Thomas.  This argument, therefore, merits no further discussion

In sum, considering that substantial evidence supports the ALJ's finding regarding Plaintiff's ability to perform light work the ALJ properly went on to determine whether Plaintiff can engage in any other substantial gainful work which exists in the national economy.[4]

---

[4] Plaintiff does not contend that the ALJ erred in any other respect under Step Five.

## B.  The ALJ properly followed the Eleventh Circuit's credibility standard.

Plaintiff also contends that the ALJ failed to follow the Eleventh

Circuit's credibility standard with regard to Plaintiff's pain testimony. (ECF

No. 16 at 1.) The Eleventh Circuit has developed a three-part pain

standard when a claimant attempts to establish disability through her own

testimony of pain or other subjective symptoms:

> The Secretary must consider a claimant's subjective testimony
> of pain if she finds evidence of an underlying medical condition,
> and either (1) objective medical evidence to confirm the
> severity of the alleged pain arising from that condition, or (2)
> that the objectively determined medical condition is of a
> severity that can reasonably be expected to give rise to the
> alleged pain.

*Foote*, 67 F.3d at 1560; *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.

1991); *Mason v. Bowen*, 791 F.2d 1460, 1462 (11th Cir. 1986); *Landry*,

782 F.2d at 1553. "If the ALJ discredits subjective testimony, he must

articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at

1225.

In this case the ALJ satisfied the Eleventh Circuit's pain standard.

The ALJ noted that "the claimant's medically determinable impairments

could reasonably be expected to cause the alleged symptoms; however,

the claimant's statements concerning the intensity, persistence and limiting

effects of these symptoms are not entirely credible for the reasons

explained in this decision. (R. 29–30.)  The ALJ not only met the first prong

of the pain standard by noting Plaintiff's underlying medical condition, but

the ALJ also met the second prong by considering whether Plaintiff's

impairments could reasonably be expected to cause her alleged

symptoms. *See Holt*, 921 F.2d at 1223 (ALJ's findings failed to contain any

indication that he considered whether plaintiff's claims were either

confirmed by objective medical evidence or could reasonably have been

expected to give rise to the pain alleged).

      In analyzing the intensity and persistence of Plaintiff's symptoms, the

ALJ found Plaintiff's statements "not entirely credible." In rejecting

Plaintiff's pain testimony as "not entirely credible," the ALJ discussed the

evidence which supports his credibility determination, including the

conflicting testimony regarding Plaintiff's daily activities, the inconsistency

in Plaintiff's  testimony regarding the use of pain medications, Plaintiff's

non-compliance with prescribed medications, Plaintiff's ability to take an

entire month off from therapy to go on vacation, and Plaintiff's failure to

reschedule mental health appointments after not going on a planned trip to

California and Oregon. (R. 29–35.)

An ALJ's factual determinations are entitled to deference. *Landry*, 782 F.2d at 1554. "[T]he ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony. *Holt*, 921 F.2d at 1223. The ALJ in this  case met his obligation by placing on the record explicit and adequate reasons for rejecting Plaintiff's pain testimony. *See Holt*, 921 F.2d at 1224 (ALJ failed to set out whether or for what reasons he discredited plaintiff's pain testimony). Therefore, the ALJ's factual determinations are entitled to deference.

Citing to *Hale*, 831 F.2d at 1011, Plaintiff also argues that the very nature of her impairments—chronic back pain and rheumatoid arthritis, coupled with Plaintiff's depression—suggest whether it may be reasonably expected to produce pain. (ECF No. 16 at 23.) The ALJ acknowledged this in his finding. The ALJ said: "the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ." (R. 29.)  But as previously discussed, the ALJ then went on to explain that Plaintiff's pain testimony is not entirely credible. "If the Secretary refused to credit such testimony, he must articulate explicit and adequate reasons." *Hale*, 831 F.3d at 1011.  As previously discussed, the ALJ did so throughout his written opinion.

Accordingly, the Court has no trouble concluding that the ALJ correctly analyzed Plaintiff's subjective complaints of pain in accordance with the Eleventh Circuit's pain standard.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on the 14th day of December, 2015.

*s/ Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**